**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RUE21 HOLDCO, INC., *et al.*,[1] | Case No. 24-10939 (BLS) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF MICHELE PASCOE IN SUPPORT
## OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Michele Pascoe, pursuant to 28 U.S.C. § 1746, and under penalty of perjury, declare the following to the best of my knowledge, information, and belief:

1.      I am the Interim Chief Executive Officer of r21 Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, "rue21" or the "Debtors") in the above-captioned cases (the "Chapter 11 Cases").  As Interim Chief Executive Officer, I am familiar with the Debtors' day-to-day operations, businesses and financial affairs, books and records, and the circumstances leading to the commencement of these Chapter 11 Cases.  I joined rue21 in 2018 as Senior Vice President, Chief Financial Officer.  From November 2023 to April 2024, I served as rue21's Executive Vice President, Chief Financial Officer and, since May 2024, I have served as its Interim Chief Executive Officer.

2.      Prior to joining rue21, I served in executive financial leadership positions across various industries, including as the Chief Financial Officer of Marsh Supermarkets, Fashion Bug,

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, are New rue21 Holdco, Inc. (4668), r21 Holdings, Inc. (1618), New rue21 Intermediate, Inc. (9166), New rue21, LLC (4521), New RSC, LLC (4690), and r services llc (9425).  The Debtors' headquarters is located at 800 Commonwealth Drive, Warrendale, PA 15086.

and Warnaco Swimwear. I hold a Bachelor of Science in Accounting from Indiana University of Pennsylvania and have over 35 years of experience in the retail apparel market.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (collectively, the "Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors intend to continue in possession of their assets and the management of their business as debtors in possession during the pendency of these Chapter 11 Cases. To minimize the adverse effects on their business, the Debtors filed motions and pleadings seeking various forms of relief (collectively, the "First Day Pleadings"). I submit this declaration (the "Declaration") to assist the Court and parties in interest in understanding the circumstances that compelled the commencement of these Chapter 11 Cases and in support of the Debtors' Petitions and the First Day Pleadings.

4.      All facts set forth in the Declaration are based on my personal knowledge, my communications with members of the Debtors' senior management team and professional advisors, my review of relevant documents, or my opinions developed through my overall professional experience and my personal knowledge of the Debtors' history, financial condition, and business operations and affairs.

5.      I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors. If called as a witness, I could and would testify competently to the matters set forth herein.

**INTRODUCTION**

6.      rue21 is a specialty fashion destination that offers comfortable, trendy, and practical apparel and accessories for all genders. With locations across the United States, rue21 is well known for promoting the latest trends at an affordable price that does not require its customers to

sacrifice style for savings.  rue21's motto—that "fashion should be fun and accessible to all"—encapsulates its brand and purpose.  As a go-to style destination for the last 44 years, rue21 was created with a vision to bring inclusive, accessible, and fashionable clothing to its customers.  Throughout its tenure, rue21 has remained committed to upholding its "open to all" policy and promoting individuality in its stores by offering an assortment of apparel and accessories in a wide range of sizes.  Rue21's primary demographic includes both adolescent and young adults.  Average household income for rue21's core customer base is approximately $50,000 annually, and its core customers are focused on making value priced purchases.

7.      The Debtors currently operate over 540 brick-and-mortar stores located in various strip malls, regional malls, and outlet centers throughout the United States.  Additionally, rue21 sells its merchandise online through its e-commerce website, rue21.com.  The Debtors are headquartered in Warrendale, Pennsylvania and have one distribution center located in Weirton, West Virginia.

8.      Over the past several years, the Debtors' business operations, like those of many of their peers in the retail space, have been negatively impacted by challenges stemming from the COVID-19 pandemic and related adverse market trends, including a shift in consumer shopping patterns from traditional brick-and-mortar retailers to online retailers and changing consumer preferences.  More specifically, the Debtors have recently experienced operational losses resulting from, among other things, underperforming retail locations, increased industry competition and the uptick in online shopping, inflation and macroeconomic headwinds, and challenges raising capital.  While the Debtors continue to generate revenue, their revenue streams—even when combined with extensive cost cutting measures—are insufficient to meet their long-term liquidity needs and working capital requirements.

9.      To help address these challenges, in the months leading up to the Petition Date, the Debtors engaged Willkie Farr & Gallagher LLP ("Willkie"), Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), Riveron RTS, LLC ("Riveron"), and Kroll Restructuring Administration LLC ("Kroll" and, collectively with Willkie, Young Conaway, and Riveron, the "Restructuring Advisors") to assist with exploring restructuring alternatives, including by marketing the Debtors' assets and soliciting bids for a value maximizing transaction. In addition, prior to the Petition Date, the board of directors of r21 Holdings, Inc. (the "Board") subsequently established a Restructuring Committee of the Board, consisting of two independent directors, to oversee the Debtors' restructuring efforts and strategic options.

10.     During the prepetition marketing process, it became apparent that proposals to purchase the Debtors' assets at a going concern value would not exceed the projected proceeds that could be realized by liquidating the Debtors' store-level inventory and assets, closing down their brick-and-mortar retail locations, and winding down operations. As such, the Debtors and their the Restructuring Advisors focused their efforts on identifying third-party consultants to evaluate and conduct large-scale store closing sales on a "going out of business" basis (the "Store Closing Sales"), and to prepare each store for turnover to the applicable landlords—all on terms that would maximize recoveries for the Debtors' stakeholders.

11.     In order to ensure that the Debtors achieved the most value maximizing proposal available under the circumstances, the Debtors spent weeks soliciting bids from, and negotiating with numerous potential bidders. Ultimately, the Debtors, in consultation with the Restructuring Advisors and Restructuring Committee, determined that a proposal from Gordon Brothers Retail Partners, LLC ("Gordon Brothers") represented the most value maximizing transaction available. On April 26, 2024, the Debtors entered into that certain *Store Closing Consulting Agreement*, by

and between Gordon Brothers Retail Partners, LLC and New rue21, LLC (the "Consulting Agreement"), which memorializes the agreement whereby Gordon Brothers will assist the Debtors with conducting the Store Closing Sales within the framework of these Chapter 11 Cases.

12.     In addition to the Store Closing Sales, and as set forth in further detail below, the Debtors intend to seek approval of formal bidding procedures and their entry into a stalking horse purchase agreement in order to achieve a value maximizing sale of certain assets that will not be liquidated through the Store Closing Sales (the "Going Concern Sale Process" and together with the Store Closing Sales, the "Sale Process").  This will include rue21's intellectual property and other intangible assets.  The Going Concern Sale Process will run on a parallel timeline to the Store Closing Sales—all of which are scheduled to close in the next two months.  The Debtors believe that the Sale Process will generate the highest recoveries possible for the Debtors' stakeholders.

13.     Overall, the Debtors' decision to file these Chapter 11 Cases and pursue the Sale Process is informed by the difficult challenges they currently face, coupled with careful deliberations by the Board, management team, Restructuring Advisors, and Restructuring Committee.  Although prevailing headwinds and tightening liquidity limited the Debtors' out-of-court options, the Debtors' significant efforts prior to the Petition Date provide a clear path to achieving a value-maximizing transaction in chapter 11 for the benefit of all of their stakeholders.

14.     To familiarize the Court with the Debtors, their business, the circumstances leading up to these Chapter 11 Cases, and the relief the Debtors seek in the First Day Pleadings, this Declaration is organized as follows:

- **Part I** provides an overview of the Debtors' corporate history, structure, and business operations;

- **Part II** describes the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to the commencement of these Chapter 11 Cases; and

- **Part IV** provides evidentiary support for the First Day Pleadings.

I.    **THE DEBTORS' HISTORY AND BUSINESS OPERATIONS**

A.    **History**

15.    The Debtors are the successor to Pennsylvania Fashions Inc., a company founded in 1970.  Upon its emergence from chapter 11 proceedings in 2003, Pennsylvania Fashions changed its name to rue21.  rue21 became a publicly traded company in 2009 with an initial public offering on the NASDAQ Global Select Market under the ticker symbol RUE.  In 2013, however, rue21's majority owners took the company private again through a transaction that involved the buyback of shares from the company's public shareholders.

16.    Following its successful emergence from bankruptcy in 2003, rue21 experienced exponential growth.  From its inception, rue21 strove to provide its customers with style, quality, and value all in one place.  rue21 continued to expand, solidifying its spot as a household name and leader in pre-teen, teen, and young adult fashion for all genders.  On July 23, 2009, rue21 opened its 500th retail store in Harlingen, Texas.  Over the next four years, the company doubled its brick-and-mortar storefronts, successfully opening its 1,000th store on November 14, 2013, in Enid, Oklahoma.

17.    rue21 continued its impressive growth and expansion until 2017 when, in the face of falling revenues, it became evident that its legacy operating structure was no longer sustainable. The Debtors, like many other apparel and retail companies at the time, faced a challenging commercial environment exacerbated by increased competition and the beginning of a shift of customer preferences away from physical retail stores.  The Debtors' substantial brick-and-mortar

presence, coupled with the fact that their business was heavily dependent on physical in-store traffic, created significant challenges to the Debtors' profitability.  In addition to this challenging retail environment, the Debtors also relied on their online presence and e-commerce platform for sales, which had historically underperformed.

18.    As a result, rue21 commenced efforts to improve its operations, including a store closing process.  Ultimately, rue21 filed for chapter 11 in May 2017 in the United States Bankruptcy Court for the Western District of Pennsylvania.  The Debtors successfully emerged from those chapter 11 cases (the "Prior Cases") having (a) reduced their funded indebtedness by over $700 million, (b) closed approximately 400 underperforming stores, and (c) renegotiated leases for go-forward stores.  The Prior Cases allowed the Debtors to preserve and fortify the value of the rue21 brand with a sustainable balance sheet and low operating leverage.

**B.    Business Operations**

19.    The Debtors offer the largest selection of products, sizes, and trends that fit every personality and budget through several rue21 brands in apparel (rue21), intimate apparel (true), and plus-size apparel (rue+).  These core rue21 brands each focus on the Debtors' guiding principle of "Affordable Fashion, Accessible to All," which aims to provide quality, yet affordable, clothing.

20.    The Debtors maintain control over their proprietary brands by designing, sourcing, marketing, and selling their own merchandise.  The Debtors do not license the rue21 brand to any third parties.  The Debtors are able to offer budget-conscious customers outstanding value on fast-fashion clothing and accessories through their extensive nationwide footprint (limited to the United States), localized assortment, low-cost business model, and robust online presence.  The Debtors' unique product development strategy has successfully amassed their customers' loyalty by ensuring popular, quality, and fashion-forward merchandise in stores for the right price.

C.      **Merchandising Strategy**

21.      An important aspect of the Debtors' business strategy is to maintain and leverage the customer loyalty generated by their core demographic—pre-teenagers, teenagers, and young adults of all genders.  To maintain and grow this loyal customer base, rue21's merchandising strategy necessitates a wide selection of core products developed in accordance with the latest fashion trends at prices significantly below most of its competitors.  The Debtors' business model is dependent on identifying "on-trend" merchandise through their branding and merchandising partners.  In order to adapt to the changing demands and preferences of customers and to stay ahead of trends within the fashion market, the Debtors utilize both their internal design methods and partnerships with third-party consultants, each of whom monitor marketplace trends and provide input on styles of clothing and accessories.  rue21 cooperates closely with various vendors, designers, and logistics providers to ensure merchandise is high quality and delivered on time.

D.      **Supply Chain**

22.      Another key to serving the Debtors' customer base with on-trend apparel and accessories is the Debtors' established global supply chain.  The Debtors maintain an integrated supply chain comprised of numerous vendors aimed at ensuring the uninterrupted flow of new merchandise to their brick-and-mortar locations and to their e-commerce customers.  The Debtors shop styles and designs offered by a variety of vendors and contract with the vendors to source and manufacture their final products.

23.      The overwhelming majority of finalized merchandise that the Debtors order from their vendors is shipped by the vendors through various third-party logistics companies.  All merchandise that will be sold in the Debtors' stores is shipped by third parties to the Debtors' Distribution Center in West Virginia and, thereafter, directly to their stores.

**E.    Retail Operations**

24.    The Debtors employ approximately 4,900 employees in the United States, approximately 1,475 of which are full-time and approximately 3,440 of which are part-time (the "Employees").  The Employees serve in many capacities including supporting the Debtors' operations at the corporate offices, the Distribution Center, and at the retail store level.  In the ordinary course of business, the Debtors have historically hired independent contractors to supplement their workforce and complete discrete projects, including individuals and vendors with specialized expertise.

25.    The Debtors currently have a national store footprint in 45 states with strong concentrations in Texas, Georgia, Ohio, North Carolina, Florida, and California.  The Debtors lease all of their store locations.  In addition, the Debtors lease approximately 84,000 square feet in Warrendale, Pennsylvania, as their corporate headquarters, as well as a photo studio.  The Debtors also lease approximately 375,000 square feet in Weirton, West Virginia to house their Distribution Center.

**PART II: PREPETITION CORPORATE AND CAPITAL STRUCTURE**

26.    A chart depicting the Debtors' current corporate structure is attached hereto as **Exhibit A**.

27.    As of the Petition Date, the Debtors have approximately $194.4 million in outstanding borrowings, consisting of (a) approximately $29.7 million in aggregate principal amount outstanding under their senior secured asset-based revolving credit facility (the "ABL Facility"), and (b) approximately $164.7 million in aggregate principal amount outstanding under their senior secured term loan credit facility (the "Term Loan Facility").  The following table summarizes the Debtors' outstanding borrowings:

| Facility Size | Maturity | Outstanding Principal Amount |
|---|---|---|
| ABL Facility | December 2025 | $29.7 million |
| Term Loan Facility | January 2026 | $164.7 million |
| | Total: | $194.4 million |

## A.      ABL Facility

28.      New rue21 Holdco, Inc., as holdings, New rue21, LLC, as borrower, the other guarantors party thereto, Bank of America, N.A as Administrative Agent, Collateral Agent, L/C Issuer and Swing Line Lender (in such capacities, the "Prepetition ABL Agent"), and the lenders from time to time party thereto (the "ABL Lenders"), are parties to that certain ABL Credit Agreement, dated as of June 7, 2021 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "ABL Credit Agreement" and, collectively with the Loan Documents (as defined therein), the "Prepetition ABL Documents").  The Prepetition ABL Documents provide for a senior secured revolving credit facility, maturing December 2025, in an amount up to $90 million (subject to borrowing base availability), including a $25 million letter of credit sublimit.  Amounts borrowed by New rue21, LLC under the ABL Credit Agreement are guaranteed by New rue21 Holdco, Inc., r services llc, and New RSC, LLC., all of which are Debtors in these Chapter 11 Cases.

29.      Subject to the terms of the Intercreditor Agreement (as defined herein), the Prepetition ABL Obligations are secured by: (x) a first priority interest in and lien on substantially all personal property of the Debtors, including, but not limited to, accounts receivable, credit card receivables, other payment rights, inventory, cash, deposit accounts, securities and commodity accounts, documents and supporting obligations (but excluding equity interests of New rue21, LLC and its subsidiaries and intellectual property and equipment) (collectively, the "ABL Priority Collateral"); and (y) a second priority security interest in and lien on the Term Loan Priority

Collateral (as defined herein).  As of the Petition Date, approximately $29.7 million is outstanding under the ABL Facility.

**B.    Term Loan Facility**

30.    New rue21, LLC, as borrower, and New rue21 Holdco, Inc., as parent, are parties to that certain *Financing Agreement*, dated as of January 24, 2022 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Term Loan Credit Agreement"), by and among Borrower, Parent, each other Guarantor (as defined therein) from time to time party thereto, each Lender (as defined therein) from time to time party thereto, and Blue Torch Finance, LLC (together with its affiliates, "Blue Torch"), as Administrative Agent and Collateral Agent (in such capacities, the "Prepetition Term Loan Agent").  The Term Loan Credit Agreement provides the Term Loan Facility, which was issued in the original aggregate principal amount of $85 million and subsequently upsized through a number of amendments to the Term Loan Credit Agreement between October 2022 and December 2023.  The Term Loan Facility matures in January 2026.  Outstanding amounts due under the Term Loan Credit Agreement are guaranteed by New rue21 Holdco, Inc., r services llc and New RSC, LLC, all of which are Debtors in these Chapter 11 Cases.

31.    Subject to the terms of the Intercreditor Agreement, the Term Loan Facility is secured by (a) a first priority security interest in and lien on all the equity interests of New rue21, LLC and its subsidiaries, and (b) a first priority lien on substantially all tangible and intangible real and personal property of New rue21, LLC and its subsidiaries (other than the ABL Priority Collateral) (the "Term Loan Priority Collateral" and, together with the ABL Priority Collateral, the "Prepetition Collateral"), and (b) a second priority lien on all of the ABL Priority Collateral. As of the Petition Date, approximately $164.7 million remained outstanding under the Term Loan Facility.

**C.      Intercreditor Agreement**

32.      The Debtors' prepetition indebtedness is subject to that certain *Intercreditor Agreement*, dated as of January 24, 2022, by and between the Prepetition ABL Agent and Prepetition Term Loan Agent (the "Intercreditor Agreement"), pursuant to which the Prepetition ABL Agent and Prepetition Term Loan Agent set forth, among other things, (a) their (and the prepetition secured creditors') relative lien priorities in the Prepetition Collateral and enforcement rights and obligations related thereto, (b) the method by and the order in which proceeds of the Prepetition Collateral shall be applied by the Prepetition ABL Agent and the Prepetition Term Loan Agent, respectively, and (c) the impact on the respective liens of the Prepetition ABL Agent and Prepetition Term Loan Agent arising from the sale or disposition of Prepetition Collateral.

**D.      Trade Credit**

33.      In the ordinary course of business, the Debtors incur obligations payable to vendors, shippers, utility providers, landlords, and others.  As of the Petition Date, the Debtors estimate approximately $65 million remains outstanding on account of unsecured trade claims.

**E.      Equity Ownership**

34.      Each of the Debtors is a private company and the Debtors are not publicly traded. As of the Petition Date, r21 Holdings, Inc. has approximately 12.1 million issued and outstanding shares of common stock.  Blue Torch, the Debtors' prepetition secured lender under the Term Loan Facility, holds a significant majority of r21 Holdings, Inc.'s common stock (i.e., approximately 80%).  As reflected in the structure chart attached hereto, New rue21 Intermediate, Inc. is a wholly owned subsidiary of r21 Holdings, Inc.; New rue21 Holdco, Inc. is a wholly owned subsidiary of New rue21 Intermediate, Inc.; New rue21, LLC is a wholly owned subsidiary of New rue21

Holdco, Inc.; and New RSC, LLC and r services llc are wholly owned subsidiaries of New rue21, LLC.

## PART III: EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Events and Operations Since the Prior Cases

35.    Following the Prior Cases, the Debtors achieved noteworthy levels of performance despite facing the COVID-19 pandemic's unprecedented impact on the retail industry in recent years.  Adjusted EBITDA in 2020 and 2021 rose to $62.5 million and $122.5 million, respectively, due to a renewed focus on operational initiatives and margin improvement.  Although the Debtors' financial performance was strong following the Prior Cases, the Debtors have recently faced strong and unexpected headwinds in the current retail environment, drastically hampering the Debtors' ability to remain profitable with their current capital structure.  In recent months, certain factors began to influence the consumer spending environment, significantly impacting the Debtors' core customer base, which struggled significantly to cope with quickly rising inflation.  A convergence of factors—including an increase in rent, food, and gas prices in a hyperinflationary environment—reduced discretionary spending for the Debtors' core customers—all of which, in turn, negatively impacted the Debtors' earnings.

36.    The destructive impact of these macroeconomic headwinds on the Debtors' performance created a liquidity shortfall that needed to be addressed to avoid defaults under the Debtors' prepetition credit facilities.  In the first instance, the Debtors' management proactively implemented cost-cutting and inventory reduction measures, including reductions in force and store closures, which had a positive impact on preserving liquidity.  However, it soon became clear that the Debtors would require additional financial support to weather the current challenges facing the retail environment.

37.     In August 2022, the Debtors engaged Ducera Partners LLC to conduct a capital raise process and potentially solve the Debtors' liquidity shortfall.  This process lasted for approximately 90 days and culminated in the then existing secured lenders agreeing to invest an additional $25 million in the Debtors in exchange for warrants, which the investing lenders subsequently exercised.  The investing lenders currently hold approximately 80% of r21 Holdings, Inc.'s common stock (assuming full vesting under the management incentive plan).

**B.    Defaults Under ABL and Term Loan Agreements**

38.     Notwithstanding the additional capital infusion from Blue Torch, in October 2022, the Debtors defaulted under the ABL Credit Agreement and Term Loan Agreement.  Between October 2022 and December 2023, the Debtors entered into several amendments to both the ABL Credit Agreement and Term Loan Agreement, whereby the ABL Lender and Term Loan Lender agreed to waive certain events of default.  In addition, as part of this process, the Term Loan Facility, originally issued in the principal amount of $85 million, was upsized to approximately $165 million in total commitments.

**C.    Prepetition Marketing Process**

39.     In light of continued operational losses and defaults under their prepetition credit facilities, in the weeks leading up to the bankruptcy filing, the Debtors and their advisors began exploring restructuring alternatives and marketing their assets and soliciting bids for a value maximizing transaction to be implemented through a chapter 11 process.  To assist with this process, Riveron immediately began working with the Debtors and Bank of America, N.A., the Debtors' Prepetition ABL Lender, to prepare a budget and cash flow forecast to support the execution of a potential transaction.  Riveron also conducted an efficient and robust marketing of the Debtors' assets on the expedited timeline required by the Debtors' liquidity constraints and available funding.  In the weeks leading up to the Petition Date, the Debtors and Riveron focused

on soliciting two types of proposals from potential bidders: (i) bids to purchase the Debtors' assets at a going concern value, and (ii) bids from third-party consultants to conduct the wind-down, closure, and liquidation of all of the Debtors' retail stores and store-level assets.

40.     During the marketing process, it became apparent that proposals to purchase the Debtors' assets at a going concern value would not exceed the projected proceeds that could be realized by conducting the Store Closure Sales and liquidating inventory and store-level assets. Accordingly, the Debtors and their Restructuring Advisors focused their efforts on identifying third-party consultants to conduct the Store Closing Sales on the most favorable terms possible.

41.     To do so, the Debtors solicited bids from various third-party consultants and held diligence sessions to determine which consultant possessed the requisite skills, resources, and experience to perform the Debtors' large-scale going out of business sales in a controlled, efficient process.  The Debtors received and, with the assistance of their Restructuring Advisors, carefully considered three formal proposals.  Notably, all potential bidders contemplated running the Store Closing Sales through a chapter 11 process.

42.     In order to ensure that the Debtors entered into a consulting arrangement on the most favorable terms possible available under the circumstances, the Debtors spent weeks negotiating the economics of the proposals.  Indeed, the Debtors and their advisors successfully negotiated material improvements to the economics and compensation structures proposed by each expert.  Following these extensive negotiations, the Debtors' determined to move forward with the proposal submitted by Gordon Brothers, which the Debtors, in consultation with their advisors and Restructuring Committee, determined represented the most value maximizing transaction available.

43.     The Debtors and Gordon Brothers subsequently engaged in arm's-length negotiations with respect to the terms of Gordon Brothers' retention and, on April 26, 2024, the Debtors and Gordon Brothers entered into the Consulting Agreement.  Pursuant to the Consulting Agreement, and subject to Court approval, Gordon Brothers will serve as the exclusive agent to the Debtors in connection with the Store Closing.

44.     Pursuant to the Consulting Agreement, the Debtors and Gordon Brothers expect to complete the Store Closing Sales in 4-6 weeks.  In addition to the Store Closing Process and shortly following the Petition Date, the Debtors intend to seek approval of formal bidding procedures and their entry into a stalking horse purchase agreement in order to commence the Going Concern Sale Process and achieve a value maximizing sale of certain assets that will not be sold through the Store Closing Sales.  These assets include the Debtors' intellectual property and other intangible assets.  In order to maximize value, the Debtors intend to run the Going Concern Sale Process on an expedited timeline and consummate a sale either before or simultaneous with the completion of the Store Closing Sales.

**D.      Consensual Use of Cash Collateral**

45.     Parallel to the marketing process, the Debtors and their advisors engaged in discussions with their prepetition secured creditors concerning the Debtors' liquidity constraints and potential funding to implement the Sale Process through the chapter 11 process.

46.     While the Debtors were in discussions with their equity sponsor regarding a potential equity contribution, when such a transaction failed to materialize, the Debtors focused on their negotiations with Bank of America, N.A. ("Bank of America"), their Prepetition ABL Lender.  Following weeks of arm's-length negotiations, Bank of America informed the Debtors that they would consent to the use of cash collateral in order to fund the Debtors' day-to-day business operations through the completion of the Sale Process.  During this time period, the

Debtors and their advisors worked closely with Bank of America to reach agreement on an approved budget that will govern the use and disbursement of cash collateral during these Chapter 11 Cases.

47.     The Debtors' access to cash collateral is an essential and necessary component of successfully completing the Sale Process through these Chapter 11 Cases.  As of the Petition Date, the Debtors have approximately $27,000 total cash on hand, all of which constitutes cash collateral. In the normal course of business, the Debtors use cash on hand and cash flow from operations and other sources to fund working capital and capital expenditures, as well as to operate and maintain their business and leased store locations.  Specifically, the Debtors rely on cash collateral to, among other things, maintain business relationships with vendors and suppliers, honor payroll obligations to employees, and satisfy other working capital and operational needs.  Absent immediate access to cash collateral, the Debtors will not have sufficient access to cash on hand to pay these critical expenses and will run out of cash in a matter of days.

48.     In addition to cash collateral, and as set forth above, the Debtors also maintain a separate pool of assets—i.e. the Term Loan Priority Collateral—upon which the Prepetition Term Loan Agent holds a first priority lien.  Certain assets in this collateral pool, including the Debtors' intellectual property and FF&E, may be sold to bidders during these Chapter 11 Cases—whether through the Going Concern Sale Process or Store Closing Sales.  I understand that, pursuant to section 506(c) of the Bankruptcy Code (as that provision has been explained to me), the Debtors are entitled to surcharge the costs of preserving, maximizing and disposing of such collateral.  As of the date hereof, the Debtors and the Prepetition Term Loan Agent have not reached an agreement on the allocation of such costs.  Based on the outcome of these negotiations or order of

the Court, the Debtors will determine, in the exercise of their fiduciary duties, whether or not to pursue the sale of the Term Loan Priority Collateral.

49.    If the Debtors are unable to fund their expenses during the Sale Process, they would be forced to liquidate in a disorderly fashion and without the structure and organization that will be provided by conducting the Sale Process through these Chapter 11 Cases.  I believe that would be a value destructive result for the Debtors and their stakeholders.

**PART IV: EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS**[2]

50.    In my capacity as Interim Chief Executive Officer, I believe that the relief requested in the First Day Pleadings is necessary and essential to ensuring that the Debtors' immediate needs are met and that the Debtors (and their stakeholders) will not suffer any immediate and irreparable harm as a result of the commencement of these Chapter 11 Cases.  My opinion as to the necessity of the First Day Pleadings is based upon my firsthand experience as Interim Chief Executive Officer and my review of various materials and information provided to me by the Debtors' senior management and the Debtors' advisors, as well as discussions had in connection therewith.  In considering the necessary first-day relief, the Debtors' senior management, the Restructuring Advisors, and I were cognizant of the level of cash on hand and the limitations imposed by the Debtors' cash collateral budget.  The Debtors have only requested the relief necessary to preserve the value of the Debtors' assets during the pendency of these chapter 11 proceedings.

---

[2]    Capitalized terms used in this section but not defined herein shall have the meaning ascribed to them in the respective First Day Motions.

**A. Motions Related to Case Management**

    **i.  Debtors' Motion for an Order Authorizing the Joint Administration of the Debtors' Chapter 11 Cases**

    51.    The Debtors seek the joint administration of their Chapter 11 Cases for procedural purposes only. Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors and, given the nature of the Debtors' operations, the treatment of certain contracts and business relationships of a single Debtor may impact the assets and operations of other Debtors. I understand that joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative hearings, notices, applications, and orders. I understand that no prejudice will befall any party by the joint administration of the Debtors' cases, as the relief sought is solely procedural and is not intended to affect substantive rights. Based on the foregoing, I believe that it would be far more efficient for the administration of these Chapter 11 Cases if the Court were to authorize their joint administration.

    **ii.  Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing Debtors to Redact Certain Personally Identifiable Information, (II) Authorizing Special Electronic Noticing Procedures For Customers, and (III) Granting Related Relief.**

    52.    The Debtors seek authorization to redact certain personally identifiable information from the Debtors' list of creditors list of equity holders attached to the Debtors' chapter 11 petitions, schedules of assets and liabilities and statements of financial affairs, and other documents. Further, the Debtors seek authorization to provide individual customers with electronic notice of pleadings during these Chapter 11 Cases.

    53.    I believe that authorizing the Debtors to redact personally identifiable information of individuals from filings in these Chapter 11 Cases, including the Debtors' customers, equity holders, and employees, is warranted. Among other reasons, such information could be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking. With

hundreds of individual creditors and interest holders, the Debtors cannot reasonably know with sufficient certainty whether a release of such individual creditors' and interest holders' personal information could potentially jeopardize their safety.

54.     Further, I believe the Court should authorize the Debtors to provide electronic service of any and all notices, documents, and pleadings filed in these Chapter 11 Cases that are required to be served on the Customers by email, which will reduce the cost and administrative burdens associated with providing such Customers with traditional means of service, reduce delay in providing notice, and provide the Debtors' estates with significant cost savings.  I believe that providing the Customers with traditional forms of notice will be unduly burdensome and cost prohibitive.  As a result, given the excessive costs of mailing notices to all current and former Customers, and because the Debtors primarily communicate with their Customers by email in the ordinary course of business, I believe that the Customers will expect to receive notice from the Debtors electronically and that such measures will provide an efficient and effective means of service.

### iii.     Debtors' Application for Entry of an Order Appointing Kroll Restructuring Administration LLC as Claims and Noticing Agent

55.     The Debtors filed an application to retain Kroll Restructuring Administration LLC ("Kroll") as their claims and noticing agent for these Chapter 11 Cases.  I believe that the retention of Kroll is critical because of the large number of creditors identified in these cases.  In addition, it has been explained to me that the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware require retention of a claims and noticing agent in cases where there are expected to be more than 200 creditors.

56.     I understand that Kroll is a leading chapter 11 administrator and data-processing firm with extensive experience in noticing, claims processing, and other administrative tasks in

chapter 11 cases.  The Debtors obtained and reviewed engagement proposals from at least two (2) other Court-approved claims and noticing agents to ensure selection through a competitive process. I believe that Kroll's rates are competitive and reasonable given Kroll's quality of services and expertise.  Given the need for the services described above and Kroll's expertise in providing such services, I believe that retaining Kroll will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their Chapter 11 efforts.

57.    The Debtors also intend to file a separate application to retain Kroll as administrative agent to provide, among other things, certain solicitation-related services.

## B.  Motions Related to Operations

### i.  Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Resolving Objections by Utility Companies and Determining any Additional Adequate Assurance of Payment, and (IV) Granting Related Relief

58.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, telecommunications, internet, water, waste removal, and other similar services (collectively, the "Utility Services") from a number of utility companies or brokers (each a "Utility Company" and collectively, the "Utility Companies").  The Debtors' business includes approximately 543 brick-and-mortar retail locations across 45 states, as well as a distribution center and corporate offices in West Virginia and Pennsylvania, respectively.  These locations require the Utility Services to function.  Among other things, the Debtors request that the Court:  (a) prohibit the Utility Companies from altering, refusing, or discontinuing the Utility Services on account of non-payment for prepetition services, including the making of demands for security deposits or accelerated payment terms; (b) determine that the Debtors have provided each of the Utility Companies with "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based on the Debtors' establishment of a

segregated account in the amount of $400,000, which equals approximately 50% of the Debtors'

estimated monthly cost of the Utility Services subsequent to the Petition Date, less the aggregate

amount of deposits held by the Utilities Companies; and (c) establish procedures for determining

additional adequate assurance of future payment, if any, and authorizing the Debtors to provide

additional adequate assurance of future payment to the Utility Companies.

59.     Uninterrupted Utility Services are essential to the Debtors' business operations and

the overall success of these Chapter 11 Cases.  Should any Utility Provider refuse or discontinue

service, even for a brief period, the Debtors' business operations could be severely disrupted,

causing immediate and irreparable harm.  I believe that without the relief requested in the motion,

the Debtors could be forced to address numerous requests by the Utility Companies in an

unorganized manner at a critical period in these Chapter 11 Cases when their efforts should be

focused elsewhere, such as on maximizing value for all of their stakeholders during the Sale

Process.  I believe that the relief requested in the motion is in the best interest of the Debtors, their

creditors, and their estates and may reduce harm and administrative expense to the Debtors' estates.

**ii.    Debtors' Motion or Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (II) Authorizing the Banks to Honor and Process Check and Electronic Transfer Requests Related thereto, and (III) Granting Related Relief**

60.     In the ordinary course of business, the Debtors collect, incur, and pay sales and use

taxes, income taxes, personal property taxes, franchise taxes and fees, and various other

governmental taxes, fees, and assessments (collectively, the "Taxes and Fees").  The Debtors remit

the Taxes and Fees to various federal, state, and local governmental units and taxing authorities

(collectively, the "Taxing Authorities") on a periodic basis in accordance with applicable law.

Payment of the Taxes and Fees is critical to the Debtors' continued, uninterrupted operations.

Further, the Debtors' failure to pay the Taxes and Fees may cause the Taxing Authorities to take

precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, seeking to lift the automatic stay, and imposing personal liability on the Debtors' officers and directors.

61.     Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business could have a wide-ranging and adverse effect on the Debtors' operations as a whole, as described further in the motion.  I believe that the authority to pay the Taxes and Fees is in the best interests of the Debtors and their estates, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtors' estates.

### iii.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, (II) Authorizing the Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief

62.     In the ordinary course of their business, the Debtors engage in a number of practices to maximize customer loyalty and sustain a positive reputation in the marketplace generally (collectively, the "Customer Programs").  The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs include, but are not limited to, the following: (a) the Gift Card Program, (b) the rue21 REWARDS Program, (c) rue21 REWARDS Credit Card Program, (d) Promotional Programs, (e) Credit CARD & Payment Processors, and (f) Refund & Exchange Program.

63.     The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  I believe that maintaining the goodwill of the Debtors' customers is important to the ongoing operations in these Chapter 11 Cases, including the Sale Process, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.  Specifically, the Debtors operate in a highly competitive global marketplace, and

the Debtors' customers can turn to any number of competitors for their apparel and accessories. As a result, I believe that the authority requested under the customer programs motion is in the best interests of the Debtors and their estates, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtors' estates and, thus, should be approved.

    **iv.**    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue their Insurance Policies and Pay All Obligations in Respect thereof, (II) Authorizing the Debtors' Banks and Other Financial Institutions to Honor and Process Checks and Transfers Related thereto, and (III) Granting Related Relief**

    64.    In the ordinary course of business, the Debtors maintain various insurance policies (the "Insurance Policies") administered by third-party insurance carriers (the "Insurance Carriers"). The Insurance Policies provide coverage for general commercial liability, business automobile liability, umbrella excess liability, property liability, cyber liability, employment practices liability, crime liability, kidnap and ransom liability, excess executive liability, directors' and officers' liability, fiduciary liability, and excess management liability.

    65.    The Insurance Policies are essential to the ongoing operation of the Debtors' businesses. The annual premiums for the Insurance Policies total approximately $3,400,000 in the aggregate. The Debtors seek authority to honor any prepetition obligations owing on account of the Insurance Policies in the ordinary course of business as they become due to ensure uninterrupted coverage thereunder.

    66.    In the ordinary course of business, the Debtors also maintain certain Premium Financing Agreements in connection with certain Insurance Policies. Pursuant to the Premium Financing Agreements, the Insurance Lender prepaid the aggregate annual amount in premiums due on account of the Financed Policies, equal to approximately $3,400,000. In exchange, the Debtors paid the Insurance Lender down payments equal to approximately $720,000 and are required to make monthly payments equal to approximately $310,000. The Debtors also obtain

certain of their Insurance Policies through a Broker.  The Broker assists the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, managing renewal data, assisting the Debtors with the procurement and negotiation of the Insurance Policies, marketing the Insurance Policies, enabling the Debtors to obtain such policies on advantageous terms at competitive rates under the Premium Financing Agreements, and providing ongoing support throughout the applicable policy periods.

67.    The Debtors' ability to maintain the Insurance Policies and renew, supplement, and modify the same as needed in the ordinary course of business is essential to preserving the value of the Debtors' businesses, operations, and assets.  Moreover, in many instances, insurance coverage is required by statutes, rules, regulations, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its Chapter 11 Case.  Accordingly, I believe the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, will avoid immediate and irreparable harm, and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**v.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Certain Prepetition Workforce Obligations and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief**

68.    The Debtors have filed a motion seeking authority to, among other things, (i) pay all unpaid prepetition wages, salaries, and compensation owed to Employees and Independent Contractors, certain quarterly sales bonuses, referral bonuses, non-insider severance benefits, expense reimbursements, and other payments owed to non-insiders, all related administrative and incidental costs, and prepetition employee benefits; (ii) pay all employment, unemployment, Social Security, Medicare, and federal, state, and local taxes relating to the Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by

the Debtors to governmental authorities, and make other payroll deductions, including, but not limited to, retirement and other employee benefit plan contributions and voluntary deductions; and (iii) honor and continue the Debtors' prepetition programs, policies, and practices as described in the Motion in the ordinary course of business.

69.     Moreover, as is customary with businesses of similar size, the Debtors have established a large portfolio of employee benefit plans, programs, and policies, including: medical coverage, dental coverage, vision coverage, life and disability insurance, a flexible spending account, a health savings account, unemployment insurance, a 401(k) plan, and other ancillary welfare programs for its employees.  The Debtors seek authority to pay prepetition obligations relating to these policies, and to continue these policies postpetition.

70.     The proposed interim and final orders, if entered, will grant the Debtors the authority to pay the employee obligations in accordance with the Debtors' prepetition practices; *provided*, *however*, that no single employee shall be entitled to receive more than $15,150 on account of prepetition employee obligations, except to the extent required under applicable state law.  The Debtors' ability to continue operations and maximize value depends, in large part, on the retention, motivation, and productivity of their workforce, whose efforts will be critical to the success of these Chapter 11 Cases.  To provide certainty to the Debtors' Employees, maintain morale and productivity, limit turnover, and minimize any adverse effect of the commencement of these Chapter 11 Cases, I believe it is necessary to continue providing ordinary course compensation and benefits to such Employees.  The total amount to be paid if the relief sought in the motion is granted is modest compared with the size of the Debtors' estates and the importance of the employees to the Debtors' sale process.

71.    In the ordinary course of business, the Debtors also maintain incentive and bonus programs to drive performance and retention among their non-insider Employees, including a quarterly sales bonus plan at the retail level and corporate level.  The Debtors are seeking authority to continue their Quarterly Sales Bonus Program and Referral Bonus Program on a postpetition basis, at the Debtors' sole discretion, to eligible non-insider Employees who do not exercise strategic control or authority over the Debtors' business or company decisions made in these Chapter 11 Cases, do not make decisions with respect to the Debtors' revenue spend, do not participate in the overall management of the Debtors, are not members of the Board, were not appointed by, nor report to, the Board, and do not attend Board meetings.

72.    The Employees perform a variety of critical functions throughout the Debtors' business in a number of capacities to support the Debtors' operations at either the Debtors' corporate offices, the distribution center, or the retail stores.  Such roles include operating and managing the Debtors' facilities; rectifying supply chain issues, if any; ensuring fulfillment goals are met; manufacturing new products and processes; establishing sales relationships with customers; and developing and maintaining quality control and compliance goals, among others. Several Employees also provide administrative, marketing, managerial, and customer service, as well as financial support services, from the Debtors' Headquarters and elsewhere.   The overwhelming majority of the Part-Time Employees are employed at one of the Debtors' various retail store locations, with a small number working in either the Debtors' corporate offices or at the distribution center.  The Full-Time Employees are employed at all levels of the Debtors' business operations.  Similarly, Independent Contractors perform a wide range of services critical to the Debtors' operations, including, among other things, providing information technology and marketing assistance to Retail and Corporate Employees, and providing peak-season store-level

staffing.  The Employees rely on the support of the Independent Contractors to complete certain tasks in furtherance of the Debtors' business.

73.     The proposed interim and final orders, if entered, will grant the Debtors the authority to pay their Workforce obligations in accordance with the Debtors' prepetition practices; provided, however, that no single individual shall be entitled to receive more than $15,150 on account of prepetition obligations, except to the extent required under applicable state law.  The Debtors' ability to continue operations and maximize value depends, in large part, on the retention, motivation, and productivity of their workforce, whose efforts will be critical to the success of these Chapter 11 Cases.  To provide certainty to the Debtors' Workforce, maintain morale and productivity, limit turnover, and minimize any adverse effect of the commencement of these Chapter 11 Cases, I believe it is necessary to continue providing ordinary course compensation and benefits to the Workforce.

74.     I believe that authorizing the Debtors to pay these Prepetition Workforce Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors, their creditors, and all parties in interest, and will enable the Debtors to continue to operate their business without disruption in an economic and efficient manner.

**vi.     Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue and Maintain their Cash Management System, Including Bank Accounts and Business Forms, (B) Continue Intercompany Transactions, and (C) Honor Certain Prepetition Obligations Related thereto, (II) Waiving Certain Operating Guidelines, (III) Extending the Time to Comply with Section 345(B) of the Bankruptcy Code, and (IV) Granting Related Relief**

75.     In the ordinary course of their business prior to the Petition Date, as is typical with businesses of similar size and scope, the Debtors maintain a centralized cash management system (the "Cash Management System") to collect, transfer, and disburse funds generated through their operations efficiently and to record such transactions accurately.  To support their operations, the

Debtors maintain a total of 550 bank accounts at thirteen (13) different banks: 1st Trust Bank, Inc., Bank of America, N.A., and Community Trust Bank, Inc... Fifth Third Bank, N.A., First State Community Bank, Hawthorn Bank, InTrust Bank, N.A., KeyBank, N.A., Montgomery Bank, Traditional Bank, Inc., U.S. Bank, N.A., Wells Fargo, N.A., and Western Commerce Bank (each, a "Bank," and collectively, the "Banks").

76.    Moreover, in the ordinary course of business, the Debtors engage in routine intercompany transactions among themselves (the "Intercompany Transactions") related to, among other things, intercompany funding and loans, which may result in intercompany receivables and payables owing between the Debtors.  These Intercompany Transactions are essential to the Debtors' business operations and are consistent with past practices by and among the Debtors.  The Cash Management System enables the Debtors to pay their financial obligations, centrally control and monitor corporate funds and available cash, reduce administrative overhead expenses, and record accurate financial data.

77.    It is my understanding that the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines") require chapter 11 debtors to, among other things, close all existing bank accounts and open new accounts (which must be designated debtor in possession bank accounts) and obtain, establish, and maintain separate debtor in possession accounts.  I also understand that section 345(b) of the Bankruptcy Code contains certain deposit, investment, and reporting requirements.

78.    The Debtors are requesting authorization to maintain their existing Cash Management System.  I believe that the Debtors' existing cash management and intercompany accounting procedures are essential to the orderly operation of the Debtors' business.  Any material interruption in the Debtors' existing Cash Management System could cause immediate and

irreparable harm, confusion, disrupt payroll, introduce inefficiency into the Debtors' operations when efficiency is most essential, and strain the Debtors' relationships with critical third parties, each of which could potentially negatively impact creditor recoveries in these Chapter 11 Cases. Moreover, it is my understanding that the majority of the Debtors' Banks are authorized depositories under the U.S. Trustee Guidelines, while the remaining Banks at which the Debtors maintain accounts are insured by the Federal Deposit Insurance Corporation.

79.     It is also my understanding that the U.S. Trustee Guidelines require chapter 11 debtors to utilize new checks bearing the designation "Debtor in Possession" and the case number for the debtor in possession accounts.  The Debtors request authority to continue using their existing business forms without reference to their status as debtors in possession until such forms are depleted, after which the Debtors intend to begin stamping or printing their business forms with "Debtor in Possession" and the chapter 11 case numbers under which these cases are being administered.

80.     Finally, the Debtors also seek authority to continue performing, in their discretion, the Intercompany Transactions, and to grant administrative expense status to obligations arising out of intercompany claims consistent and in accordance with historical practice.  These Intercompany Transactions promote efficiency and ensure that the Debtors operate in an orderly fashion.

81.     I believe that allowing the Debtors to maintain their Cash Management System, continue Intercompany Transactions, continue to use their customary business forms and modify certain requirements under section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines would be in the best interests of the Debtors' estates, creditors, and other parties in interest.

vii.   **Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief**

82.    The Debtors have engaged Gordon Brothers Retail Partners, LLC (the "Consultant") to facilitate store closing and "going out of business" sales at the Debtors' brick-and-mortar locations.  After arm's-length negotiations with several other third-party consultants, the Debtors concluded in their business judgment that (a) the services of the Consultant are necessary (i) for a seamless and efficient large-scale store closing process, and (ii) in order to maximize the value of the saleable inventory located in the Stores and the associated furniture, fixtures, and equipment, and (b) the Consultant is qualified and capable of performing the required tasks in a value-maximizing manner.  I believe that the Store Closing Sales are critical for the Debtors to efficiently administer their estates during the pendency of these Chapter 11 Cases, and assumption of the Consulting Agreement will allow the Debtors to conduct the Sales and Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates.

83.    I believe that the procedures for closing the Stores represent the most efficient and appropriate means of maximizing the value of the Store Closure Assets, while balancing the potentially competing concerns of landlords and other parties in interest.  Delay in approving the start of the Store Closing Sales would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons, including that the Stores are a drain on liquidity.  Therefore, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure Assets and the termination of operations at the Stores.  Further, the swift and orderly commencement of the Store Closing Sales will allow the Debtors to timely reject the Store leases, and therefore avoid the accrual of unnecessary administrative expenses for rent payment.

84.     Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state, provincial, and local laws, statutes, rules, regulations, and ordinances (collectively, the "Liquidation Sale Laws"), which may hamper the Debtors' ability to maximize value in selling their inventory.  The Debtors submit that to the extent the Store Closing Procedures conflict with the Liquidation Sale Laws, the Store Closing Procedures should control.  This will allow the Debtors to maximize the value of their inventory.  I believe, and the Debtors have determined, in the exercise of their reasonable business judgment and in consultation with their advisors, that the Store Closing Procedures and the proposed Dispute Resolution Procedures to orderly resolve disputes between the Debtors and any Governmental Units due to the Store Closing Procedures will provide the best, most efficient, and most organized means of selling the Store Closure Assets to maximize their value for the estates.

85.     Many U.S. states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws").  These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.  The nature of the Store Closings will result in a substantial number of employees being terminated during the Store Closings.  To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible under normal payment procedures.  However, the Debtors' payroll systems will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with the Fast Pay Laws. Given the number of employees who will be terminated during the Store Closings, I believe that compliance with the Fast Pay Laws would require the

Debtors to pay terminated employees within a time frame that would be detrimental to the conduct of these Chapter 11 Cases, if not impossible.

86.     The Debtors seek approval of a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closing Sales.  In certain cases, the contemplated Store Closing Sales may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go-dark" provisions and landlord recapture rights).  I believe that such restrictions would also hamper the Debtors' ability to maximize value in selling their inventory.  Additionally, the Debtors will be harmed if any entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf, interferes with or otherwise impedes the conduct of the Store Closings, the Sales, or institute any action against the Debtors in any court (other than in the Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings, the Sales, or the advertising and promotion (including through the posting of signs) of the Sales.

87.     The Debtors seek approval to abandon certain owned FF&E remaining in the Stores.  The Debtors intend to sell any marketable owed FF&E present in the Stores.  However, the Debtors may determine that the cost associated with holding or selling that property exceeds the proceeds that will be realized from its sale, or such property will not be saleable at all.  In such cases, I believe that retaining the property would be burdensome to the Debtors' estates and the property would be of inconsequential value.  The Debtors therefore believe that abandonment of such property is in the best interests of their estates.

88.    I believe that the relief requested in the Store Closings Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to efficiently administer their estates during the pendency of these Chapter 11 Cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Store Closings Motion should be approved.

## C.  Motions Related to Financing

> **viii.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief.**

89.    I believe that the relief requested in the Store Closings Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to efficiently administer their estates during the pendency of these Chapter 11 Cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Store Closings Motion should be approved.

90.    Concurrently herewith, the Debtors filed a motion seeking authority to use their Cash Collateral on a postpetition basis for the purpose of funding expenses that are incurred (including estate professional fees and employee costs) during these Chapter 11 Cases to preserve the value of the Collateral.  The Debtors are in immediate need of cash to continue their operations. I believe that access to the Cash Collateral is an essential component to completing the Sale Process.  Specifically, the Debtors' continued use of Cash Collateral will provide the necessary liquidity to fund the sale process and the Debtors' operating expenses, working capital, and other needs during these Chapter 11 Cases.  In the normal course of business, the Debtors use cash on hand and cash flow from operations and other sources to fund working capital and capital expenditures, as well as to operate and maintain their business and properties.  In other words, the Debtors must obtain the ability to use Cash Collateral in order to continue the operation of their business and stores, maintain business relationships with vendors and suppliers, honor payroll

obligations to employees, satisfy other working capital and operational needs, and preserve the value of their assets until the Sale Process can be completed.

91.     Absent immediate access to Cash Collateral, the Debtors will not have adequate unencumbered cash on hand to pay these critical expenses and expenses necessary to administer these Chapter 11 Cases and will run out of cash in a matter of days—which would force the Debtors to convert these cases, close their stores prematurely and liquidate on a piecemeal basis immediately and without the organization and structure provided by conducting the Sale Process through these Chapter 11 Cases.  That would be a value destructive result for the Debtors and their stakeholders.

92.     Accordingly, I believe that the relief requested in the Cash Collateral Motion is necessary to avoid immediate and irreparable harm to the Debtors and is critical to the Debtors' efforts to maximize value for their stakeholders and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, for the reasons set forth in the motion and the declaration filed in support thereof, I respectfully submit that the Cash Collateral Motion should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated:  May 2, 2024             */s/ Michele Pascoe*
                                _____
                                Name: Michele Pascoe
                                Title: Interim Chief Executive Officer

## Exhibit A

**Organizational Chart**

