IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEW RUE21 HOLDCO, INC., *et al.*,[1] | Case No. 24-10939 (BLS) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF COLIN M. ADAMS IN SUPPORT OF THE
DEBTORS' MOTION FOR ENTRY OF ORDER (I) AUTHORIZING THE
USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION
TO THE PREPETITION SECURED CREDITORS, (III) SCHEDULING
A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

I, Colin M. Adams, hereby declare, under penalty of perjury, as follows:

1. I am a Practice Lead at Riveron RTS, LLC ("Riveron"), which has its principal office at 461 Fifth Avenue, 12th Floor, New York, NY 10017. In the weeks leading up to the Petition Date, Riveron has served as financial advisor to New rue21 Holdco, Inc. and its debtor affiliates (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

2. I submit this declaration (the "Declaration") on behalf of the Debtors and in support of the *Debtors' Motion for Entry of Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "Motion"), which was filed concurrently herewith.[2]

3. I am generally familiar with the Debtors' business, financial conditions, policies and procedures, day-to-day operations, and books and records. Except as otherwise indicated, the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, are New rue21 Holdco, Inc. (4668), r21 Holdings, Inc. (1618), New rue21 Intermediate, Inc. (9166), New rue21, LLC (4521), New RSC, LLC (4690), and r services llc (9425). The Debtors' headquarters is located at 800 Commonwealth Drive, Warrendale, PA 15086.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

statements in this Declaration are based on: (i) my personal knowledge of the Debtors' operations; (ii) my review of relevant documents; (iii) information provided to me by employees of Riveron working under my supervision; (iv) information provided to me by, or discussion with, members of the Debtors' management team, other employees, or the Debtors' other advisors; or (v) my general experience and knowledge.

4. I am over the age of 18 and am duly authorized to submit the Declaration on behalf of the Debtors and in support of the Motion. If called upon to testify, I could and would testify to the facts set forth herein.

## Background and Qualifications

5. Riveron is a business advisory firm specializing in accounting advisory, corporate restructurings, operations improvement, dispute resolution, tax advisory, and valuation. Riveron has extensive experience working with and for distressed companies in complex financial and operational restructurings, both out-of-court and in chapter 11 proceedings throughout the United States. Riveron professionals have advised debtors, creditors, and equity constituents in numerous reorganizations, which advisory services have included financial analysis and budgeting, forecasting, cash management, operational assessments and improvements, dispute litigation advisory, and interim management services. Riveron and Riveron professionals have been involved in numerous chapter 11 and international bankruptcies in capacities including advisor to official committees of creditors, advisor to official equity committees, advisor to secured and unsecured holders of debt, advisor to debtors, and serving as a Chief Restructuring Officer.

6. I am a newly appointed Practice Lead at Riveron. I have more than 20 years of experience in the restructuring sector, having been both an advisor and a principal in numerous U.S. and European restructurings. Prior to joining Riveron, I served as a Partner at Ducera Partners LLC for one year. Prior to Ducera Partners LLC, I spent approximately six years as a Senior

Managing Director of M3 Partners, where I focused on companies experiencing financial, operational or strategic transitions in an effort to maximize value for stakeholders. Prior, I served as a Managing Director at Morgan Stanley & Co., LLC in New York and London from 2010 to 2017 and as a Managing Director at Citadel Securities in New York from 2009 to 2010. Earlier in my career, I was a partner at Kirkland & Ellis LLP in New York. I have also held numerous independent director roles on the board of directors of companies across a wide range of industries, such as von Drehle Corporation, Ryze Renewables and, most recently, CAMP. I hold a J.D. with a Certificate in Business Law from the University of California, Los Angeles School of Law and graduated with an A.B. in Economics and History from Duke University.

7. Over the course of my career, I have served as an advisor, attorney, officer, or investor in chapter 11 cases such as Akorn Holdings, LLC, American Airlines, Belk, Bertucci's, Cengage Learning, Colt Defense, Cornerstone Propane, Craftworks, Energy Future Holdings, Extended Stay Hotels, General Motors, GST Auto Leather, Neiman Marcus, Paper Source, Relativity Media, Remington Outdoor, Sears, Solutia, Tailored Brands, Tronox, and WorldCom.

8. Riveron has a wealth of experience providing advisory and interim management services for companies undergoing transformations, turnarounds, and restructurings. Its clients include companies, creditors, corporate parents, and financial sponsors as well as acquirers of underperforming businesses. Riveron and its professionals have extensive experience working with financially troubled companies across a variety of industries in complex financial restructurings, both out of court and in chapter 11 cases. Major in-court restructurings in which Riveron has been involved include: In re Armstrong, No. 22-10426 (MFW) (Bankr. D. Del. May 8, 2022); In re Stimwave Tech., Inc., No 22-10541 (KBP) (Bankr. D. Del. June 15, 2022); Eagle Valley Energy Partners, LLC, No. 23-10034 (SMR) (Bankr. W. Tex. Jan. 27, 2023); Aluminum

Shapes, LLC, No. 21-16520 (Bankr. N.J. Aug. 15, 2021); In re LATAM Airlines Grp., SA, No. 20-11254 (JLG) (Bank. S.D.N.Y. May 26, 2020); TECT Aerospace Grp. Holdings, Inc., No. 21-10670 (KBO) (Bankr. Del. Apr. 5, 2021). In re ORG GC Midco, LLC, No. 21-90015 (MI) (Bankr. S.D. Tex. Nov. 11, 2021); In re Remora Petroleum, L.P., No. 20-34037 (DRJ) (Bankr. S.D. Tex. Sept. 17, 2020); In re Whiting Petroleum Corp., No. 20-32021 (DRJ) (Bankr. S.D. Tex. June 10, 2020); In re Ravn Air Grp., Inc., No. 20-10755 (BLS) (Bankr. D. Del. May 18, 2020); In re PES Holdings, LLC, No. 19-11626 (KG) (Bankr. D. Del. Sept. 19, 2019).

9. Since being retained, Riveron has worked closely with the Debtors' management and other professionals retained by the Debtors in these Chapter 11 Cases, and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

### The Debtors' Prepetition Indebtedness

10. I understand that as of the Petition Date, the Debtors have approximately $194.4 million in principal amount outstanding under their funded debt obligations, consisting of (i) approximately $29.7 million in aggregate principal amount outstanding under their senior secured asset-based revolving credit facility (the "ABL Facility"), and (ii) approximately $164.7 million in aggregate principal amount outstanding under their senior secured term loan credit facility (the "Term Loan Facility").

11. The ABL Facility is secured by a (i) first priority interest lien on substantially all personal property of the Debtors, including, but not limited to, accounts receivable, credit card receivables, other payment rights, inventory, cash, deposit accounts, securities and commodity accounts, and documents and supporting obligations related to the foregoing (collectively, the "ABL Priority Collateral"); and (ii) second priority lien on the Term Loan Priority Collateral (as defined below). The Term Loan Facility is secured by a (i) first priority lien on all of the equity

interests of New rue21, LLC and its subsidiaries, (ii) first priority lien on substantially all tangible and intangible real and personal property of New rue21, LLC and its subsidiaries (other than the ABL Priority Collateral) (the "Term Loan Priority Collateral" and, together with the ABL Priority Collateral, the "Prepetition Collateral"), and (iii) second priority lien on all of the ABL Priority Collateral.

12.    I understand that the Prepetition ABL Agent and Prepetition Term Loan Agent are parties to the Intercreditor Agreement, which sets forth, among other things, (i) their (and the Prepetition Secured Creditors') relative lien priorities in the Prepetition Collateral and enforcement rights and obligations related thereto, (ii) the method by and order in which proceeds of the Prepetition Collateral shall be applied by the ABL Agent and Term Loan Agent, respectively, and (iii) the impact on the respective liens of the ABL Agent and Term Loan Agent arising from the sale or disposition of Prepetition Collateral.

13.    It is also my understanding that, pursuant to Intercreditor Agreement, the ABL agent may approve, and has approved, on behalf of the Prepetition Secured Creditors, the Debtors' use of Cash Collateral.

14.    In addition to Cash Collateral, and as set forth above, the Debtors also maintain a separate pool of assets—i.e., the Term Loan Priority Collateral—upon which the Prepetition Term Loan Agent holds a first priority lien. Certain assets in this collateral pool, including the Debtors' intellectual property and FF&E, may be sold to bidders during these Chapter 11 Cases—whether through the Going Concern Sale Process or Store Closing Sales. I understand that, pursuant to section 506(c) of the Bankruptcy Code (as that provision has been explained to me), the Debtors are entitled to surcharge the costs of preserving, maximizing, and disposing of such collateral. As of the date hereof, the Debtors and the Prepetition Term Loan Agent have not reached an

agreement on the allocation of such costs. Based on the outcome of these negotiations or order of the Court, the Debtors will determine, in the exercise of their fiduciary duties, whether or not to pursue the sale of the Term Loan Priority Collateral.

### The Material Terms Of The Debtors' Use Of Cash Collateral

15. As further described in the Motion, in consideration for the Prepetition Secured Creditors' consent to the use of Cash Collateral, the Debtors have agreed to the terms and conditions provided in the Proposed Orders.

16. I believe that the terms and conditions provided in the Proposed Orders are the product of good faith, arm's-length negotiations between the Debtors and the Prepetition Secured Creditors. I also believe that the Debtors' agreement to the terms and conditions was necessary to secure their access to Cash Collateral under the facts and circumstances of these Chapter 11 Cases and represents a reasonable exercise of the Debtors' business judgment.

### The Debtors' Immediate Need to Use Cash Collateral

17. The Debtors commenced these Chapter 11 Cases to implement a value maximizing transaction for the benefit of their stakeholders.[3] After a comprehensive prepetition marketing process, the Debtors and their advisors determined that liquidating their store-level inventory and assets through large-scale store closing or "going out of business" sales, together with conducting an expedited sale process to sell their remaining assets at a going concern value, would result in their stakeholders recovering the maximum amount possible under the circumstances (the "Sale Process").

---

[3] The Debtors' prepetition marketing process and efforts to secure a value maximizing transaction are further described in my declaration in support of the Debtors' Store Closing Motion and the First Day Declaration, both of which were filed concurrently herewith.

18. Parallel to the marketing process, the Debtors and their advisors engaged in discussions with their Prepetition Secured Creditors concerning the Debtors' liquidity constraints and potential funding to implement the Sale Process through the chapter 11 process. While the Prepetition Secured Creditors were unwilling to provide new capital to the Debtors, the Prepetition Secured Creditors informed the Debtors that they would consent to the use of Cash Collateral in order to fund the Debtors' day-to-day business operations through the completion of the Sale Process. Accordingly, in the weeks leading up to the Petition Date, the Debtors and their advisors worked closely with the Prepetition Secured Creditors to reach agreement on the Proposed Orders and Approved Budget, which will govern the use and disbursement of Cash Collateral during these Chapter 11 Cases.

19. I believe that the Debtors' access to Cash Collateral is an essential and necessary component of successfully completing the Sale Process through these Chapter 11 Cases. As of the Petition Date, the Debtors have approximately $27,000 total cash on hand, all of which constitutes Cash Collateral. In the normal course of business, the Debtors use cash on hand and cash flow from operations and other sources to fund working capital and capital expenditures, as well as to operate and maintain their business and leased store locations. Specifically, the Debtors rely on Cash Collateral to, among other things, maintain business relationships with vendors and suppliers, honor payroll obligations to employees, and satisfy other working capital and operational needs. Absent immediate access to Cash Collateral, the Debtors will not have adequate unencumbered cash on hand to pay these critical expenses and will run out of cash in a matter of days.

20. I understand that if the Debtors are unable to fund their expenses during the Sale Process, they would be forced to liquidate in a disorderly fashion and without the structure and organization that will be provided by conducting the Sale Process through these Chapter 11 Cases.

I believe that would be a value destructive result for the Debtors and their stakeholders. Accordingly, I believe that the use of Cash Collateral, including pending the Final Hearing, is necessary to avoid immediate and irreparable harm to the Debtors and is critical to the Debtors' efforts to maximize value for their stakeholders.

### The Prepetition Secured Creditors Are Adequately Protected

21. As described in the Motion and Proposed Orders, as adequate protection for the interests of the Prepetition Secured Creditors in the Prepetition Collateral (including Cash Collateral), the Debtors propose to provide the Prepetition Secured Creditors with (i) to the extent of any diminution in value of the Prepetition Collateral, valid, binding, enforceable, non-avoidable, and perfected replacement and additional postpetition security interests in, and liens on the Prepetition Collateral, (ii) superpriority claims, to the extent to that the Adequate Protection Liens do not adequately protect against any diminution in value of the Prepetition Agents' interests in the Prepetition Collateral, of claims with priority in payment, and (iii) payment of certain reasonable and necessary professional fees and expenses.

22. I believe that the terms and conditions on which the Debtors may use Cash Collateral have been carefully designed to meet the dual goals of sections 361 and 363 of the Bankruptcy Code. Under the Proposed Orders, the Debtors will have working capital to operate their business as a going-concern during the "going out of business" sales and Sale Process. This will allow the Debtors to maximize the value of the assets for the benefit of their stakeholders. At the same time, the Prepetition Secured Creditors will be adequately protected in a manner that they have agreed to for consenting to the Debtors' use of Cash Collateral.

23. In light of the foregoing, I believe that the proposed adequate protection to be provided for the benefit of the Prepetition Secured Creditors is appropriate. The Debtors' proposed

adequate protection not only is necessary to protect the Prepetition Secured Creditors against any diminution in value, but is also fair and appropriate under the circumstances of these Chapter 11 Cases to ensure that the Debtors are able to continue using Cash Collateral for the benefit of their estates and all parties in interest.

## **CONCLUSION**

24. Accordingly, it is my belief that there is a strong justification for the relief requested in the Motion.

[*Remainder of Page Left Intentionally Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 2nd day of May, 2024.

*/s/ Colin M. Adams*
Colin M. Adams
Practice Lead
Riveron RTS, LLC

*Proposed Financial Advisor to the Debtors*
