**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>NEW RUE21 HOLDCO, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-10939 (BLS)<br><br>(Jointly Administered)<br><br>Re: D.I. 17, 44, 112 |

**TANGER MANAGEMENT, LLC'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED CREDITORS, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

Tanger Management, LLC ("Tanger"), as a shopping center landlord, owner and lessor of certain nonresidential real properties, hereby submits its objection ("Objection") to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Creditors, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (D.I. 17) (the "Cash Collateral Motion"). In support of its Objection, Tanger respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Court should require the prompt payment of stub-rent to Tanger and other landlords as a condition to final approval of the use of cash collateral. The Debtors' secured lenders are using the Chapter 11 process to liquidate their collateral and are incurring significant administrative expenses in doing so – for example, by running going out of business sales in

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, are New rue21 Holdco, Inc. (4668), r21 Holdings, Inc. (1618), New rue21 Intermediate, Inc. (9166), New rue21, LLC (4521), New RSC, LLC (4690), and r services llc (9425). The Debtors' headquarters is located at 800 Commonwealth Drive, Warrendale, PA 15086.

Tanger's leased premises – yet have not committed to paying the costs in doing so. As reflected in the budget filed by the Debtors, the Debtors do not reflect making any payment of stub rent to the landlords prior to June[2] and will finish May with $0 in cash and negative availability of approximately $6.875 million, leaving the possibility of administrative insolvency and a potential conversion of these cases.

2.  Although the budget does include a small amount for a "wind down", this amount does not appear in the carve-out and it is unclear whether the amount budgeted for in the wind down is sufficient to pay all administrative costs of these cases and confirm a plan. Thus, absent a commitment to pay all stub-rent and other rent that accrues in the Chapter 11 case (including by adding the stub-rent to the carve-out), the risk of administrative insolvency will fall upon Tanger and the other landlords while the Prepetition Secured Parties will benefit from the use of the landlords' leased premises to monetize their collateral.

3.  Final approval of the Cash Collateral Motion should be denied absent the changes set forth in this Objection.[3]

## BACKGROUND

4.  Tanger is a shopping center landlord from whom the Debtors lease approximately twenty-one (21) store locations (the "Premises"). The Premises are all located in shopping centers as that term is used in section 365(b)(3) of the Bankruptcy Code. *See In re Joshua Slocum, Ltd.*, 922 F.2d 1081 (3d Cir. 1990).

---

[2] Confusingly, the budget does not show any accrual of stub rent in May, yet shows the incurrence of an additional $6.033 million of rent in June. For the reasons set forth in this Objection, the Prepetition Lenders should be required to pay all administrative rent, including all amounts that arise on June 1, 2024.

[3] Capitalized terms used but not otherwise defined herein are defined in the First Day Declaration, Cash Collateral Motion, and/or Interim Cash Collateral Order.

5. On May 2, 2024 (the "Petition Date"), the above-captioned debtors (hereinafter, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. On the Petition Date, the Debtors filed the *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* (D.I. 12) (the "Store Closing Motion"). The Store Closing Motion was approved by the Court on an interim basis on May 3, 2024 (D.I. 77) (the "Interim Store Closing Order"). The Debtors expect that the store closing and going out of business sales will end no later than May 31, 2024. (D.I. 77-1, § 2 (A)). Once the Store Closing Motion is approved on a final basis, the Debtors will liquidate all of the ABL Collateral and certain Term Priority Collateral – something that could not be accomplished without using the Premises.

7. Also on the Petition Date, the Debtors filed the Cash Collateral Motion and an initial cash collateral budget (D.I. 44). Within the Cash Collateral Motion, the Debtors sought authority to grant certain protections to the Prepetition Secured Creditors, including a waiver of any of the Debtors' surcharge rights under section 506(c) of the Bankruptcy Code with respect to the Prepetition ABL Lenders and Prepetition ABL Agent upon entry of a final order ("506(c) Waiver"). (D.I. 17, ¶¶ 32-34). On May 3, 2024, the Court entered an order approving the Cash Collateral Motion on an interim basis (D.I. 78) (the "Interim Cash Collateral Order").

8. In pertinent part, the Interim Cash Collateral Order provides that upon entry of the final order, "the Debtors have agreed as a condition to the use of Cash Collateral that the Prepetition ABL Lenders and Prepetition ABL Agent are entitled to receive … a waiver of the provisions of section 506(c) of the Bankruptcy Code." (D.I. 78, ¶ K). It further provides that upon entry of the final order, "no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or Successor Cases at any time shall be charged against the Prepetition ABL Lenders, the Prepetition ABL Agent, and/or the ABL Priority Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise and all rights to surcharge the Prepetition ABL Lenders, the Prepetition ABL Agent, and/or the ABL Priority Collateral under section 105 or 506(c) of the Bankruptcy Code or any other applicable principle or equity or law shall be and are hereby finally and irrevocably waived, and such waiver shall be binding upon the Debtors and all parties in interest in the Chapter 11 Case or any Successor Case." (D.I. 78, ¶ 22). It also contains the following provision:

> the Debtors are authorized to surcharge any Term Priority Collateral (including proceeds thereof) in an amount equal to the reasonable, necessary costs and expenses (if any) of preserving, or disposing of the Term Priority Collateral. Notwithstanding anything to the contrary herein, the rights of all parties with respect to whether any net proceeds resulting from the Prepetition Collateral should be deemed proceeds resulting from ABL Priority Collateral or Term Priority Collateral, are expressly preserved. The Debtors shall use best efforts to track all expenses related to, and proceeds of, Term Priority Collateral. All rights of the Prepetition Term Agent to dispute any purported surcharge of the Term Priority Collateral are hereby reserved.

(D.I. 78, ¶ 23). The inclusion of the language preserving the rights as between the Prepetition Secured Creditors reflects that the Debtors' ongoing use of Tanger's store locations benefits the Prepetition Term Loan Lenders as well.

4

9. On May 9, 2024, the Court entered the *Order Approving Stipulation Among the Debtors, the Prepetition ABL Agent and the Prepetition Term Loan Agent Regarding the Use of Cash Collateral* (D.I. 112), which approved the Stipulation attached thereto as Exhibit A (D.I. 112-1) (the "Stipulation"). Included as part of the Stipulation as Exhibit 1 were a series of terms and conditions that will be included in the proposed final cash collateral order. (D.I. 112-1, Ex. 1). One of these provides that:

> Subject to entry of the Final Order, the Prepetition Term Loan Agent and Prepetition Term Loan Lenders shall be entitled to receive a waiver of (x) any equities of the case exceptions or claims under section 552(b), and (y) the provision of section 506(c) of the Bankruptcy Code. Subject to entry of the Final Oder, the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders shall not be subject to the equitable doctrine of "marshaling" nor any other similar doctrine with respect to any of the Term Priority Collateral.

(D.I. 112-1, Ex. 1, ix). The Stipulation also included, as Exhibit 2, the Approved Budget (D.I. 112-1, Ex 2) (the "Budget").

10. On May 15, 2024, the Debtors filed the *First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Unexpired Leases of Nonresidential Real Property Effective as of the Rejection Date and Abandon Personal Property* (D.I. 137) (the "First Rejection Motion"). None of Tanger's leases are included in the First Rejection Motion.

11. The Budget covers a six-week period. At the end of the six seeks, the Debtors project that they will have $0 cash on hand and negative availability of $6.875 million. The Budget only shows an accrual of rent, but does not show its payment. The post-petition "Rent and CAM" accrual occurs during week 5, the week ending on June 1, 2024. Debtors' counsel indicated that this figure represents the stub-rent (May 2, 2024 – May 31, 2024), however, it is

unclear why the Debtors used week 5 as the accrual date for stub-rent as this rent accrued during May.[4]

12.     Even if stub-rent is included in the Budget as an accrued liability,[5] there is no provision in the order that the stub-rent will actually be paid to Tanger or other landlords. Furthermore, the weekly Revolver Pay Downs increase the likelihood of administrative insolvency and add further downward pressure on the Debtors' cash position, which, in turn, decreases the possibility that stub-rent will be paid.

13.     If the Prepetition Secured Creditors call a default and/or the Chapter 11 Cases convert to chapter 7, there is no mechanism for the prompt payment of stub-rent and it is likely that the stub-rent and other Chapter 11 expenses that are not part of the carve-out will never be paid. If this were to occur, section 506(c) of the Bankruptcy Code would be the only potential mechanism for payment of the stub-rent. As it stands, the Budget reflects that the Debtors are using Tanger's store locations to enable the Prepetition Secured Parties to extract the value generated from the liquidation of the ABL Priority Collateral and certain Term Priority Collateral with potentially not paying the cost to do so.

## ARGUMENT

14.     Final approval of the Cash Collateral Motion should be denied unless the order is revised to provide for the immediate payment of stub-rent to Tanger or an inclusion of the

---

[4]     It is possible that the rent shown in the Budget as accruing during week 5 will be post-petition rent for the month of June, all of which will be due and payable on June 1st. *See Montgomery Ward*, 268 F.3d 205, 209 (3d Cir. 2001).

[5]     As of the date of the filing hereof, the Debtors have neither filed a proposed final cash collateral order nor an updated version of their budget. Consequently, Tanger's Objection is founded on the language that appears in the Cash Collateral Motion, Interim Cash Collateral Order, and Budget. Tanger reserves the right to supplement this Objection upon the filing of the proposed final cash collateral order.

stub-rent in the carve-out. The Debtors initiated the Chapter 11 Cases to facilitate the orderly liquidation of the ABL Priority Collateral and Term Loan Priority Collateral and without the inclusion of a provision in the proposed final cash collateral order that ensures stub-rent will be paid, the Court should deny the Cash Collateral Motion.

15. Courts often refuse to approve the use of cash collateral, including the grant of 506(c) waivers when the lenders refuse to pay the administrative costs of a chapter 11 case. *See, e.g.*, *In re Townsends, Inc.*, Case No. 10-14092 (CSS) (Bankr. D. Del. Jan. 21, 2011) (D.I. 338), Hr'g Tr. at 23:25-24:9 (refusing to approve post-petition financing to run a sale process that would leave the estate administratively insolvent); *In re NEC Holdings Corp.*, Case No. 10-11890 (PJW) (Bankr. D. Del. July 13, 2010) (D.I. 224), Hr'g Tr. at 100:17-22, 101:7-13 (observing that the secured lender has to "pay the freight" – meaning, the secured lender must provide beyond "a wing and a prayer" for the payment of administrative claims – and indicating the Court would not be inclined to provide a 506(c) waiver over the objection of the creditors' committee); *In re Mortg. Lenders Networks USA, Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del. Mar. 20, 2007) (D.I. 346), Hr'g Tr. at 21:4-5, 21:7-13 (acknowledging that surcharge waivers require creditor consent); *In re Motor Coach Indus. Int'l, Inc.*, Case No. 08-12136 (BLS) (Bankr. D. Del. Oct. 17, 2008), Hr'g Tr. at 120:8-19 (holding that the Court would not approve a section 506(c) waiver and stating that "as a practical matter, I cannot recall a case…where I have approved this kind of relief [liens on avoidance actions and a 506(c) waiver], over a committee objection.").

16. As explained by the Court previously, "if a case is being run for the benefit of the lenders in order to foreclose upon their collateral, the lenders are going to have to pay the cost of that. And that includes all administrative. It includes the rent. It includes professional fees." *In re Sports Authority Holding, Inc.*, Case No. 16-10527 (MFW) (Bankr. D. Del. Apr. 28,

7

2016 (D.I. 1463), Hr'g Tr. at 194:16-20.  Further "in a case where the landlords and other administrative claims are clearly not budgeted or being paid while the [] secured lenders' collateral is being liquidated and their secured claim is being paid, [the Court has] a serious problem with that [and] the fix is no 506(c) waiver for anybody.  And to the extent that administrative claims are not being paid at the end of [the] case, there will be a claim against the lenders for those costs under 506(c) to the extent they were necessary for the preservation or realization of their collateral." *Id.* Hr'g Tr. at 195:7-16.  At bottom, secured creditors cannot liquidate their collateral in bankruptcy without paying the freight. *Id.* Hr'g Tr. at 196:20-21.

17. Without the Debtors' continued use of Tanger's and other landlords' leased premises, there would be no proceeds realized from the store closing and going out of business sales.  As set forth in the Budget, the Debtors propose to make weekly disbursements to the Prepetition Secured Creditors from proceeds derived from the use and occupancy of Tanger's leased premises while not paying the rent.  It is inappropriate and inequitable to grant the 506(c) Waiver or permit these bankruptcy cases to continue without requiring the Debtors pay stub-rent promptly to Tanger and other landlords, or at a minimum, to include these amounts in the carve-out to ensure that they will ultimately be paid.  Absent these protections, the Prepetition Secured Creditors will enjoy all of the upside of using Tanger's property during these cases with potentially not having to pay the administrative costs incurred in doing so.

18. Final approval of the Cash Collateral Motion, including approval of the 506(c) Waiver, should only be granted if the Debtors commit to paying stub-rent promptly or if the stub-rent is included as part of the Carve-Out for landlords.  In the absence of this change to the proposed final cash collateral order, the Court should deny the Cash Collateral Motion.

**RESERVATION OF RIGHTS**

19. Tanger reserves all rights regarding the allowance and payment of its stub-rent claims, administrative expense claims, and/or rejection damages claims during the pendency of the Chapter 11 Cases. Further, Tanger does not waive and hereby preserves all of its rights, remedies, and arguments with respect to its leases.

**JOINDER IN OTHER OBJECTIONS**

20. Tanger hereby joins in the objections to the Cash Collateral Motion filed by the Debtors' other landlords or the Official Committee of Unsecured Creditors to the extent that such objections are not inconsistent with the provisions hereof.

**CONCLUSION**

21. Wherefore, Tanger respectfully requests that the Court (a) sustain this Objection, (b) grant relief consistent with the foregoing objection, and (c) grant any such other and further relief as may the Court deems just and proper.

| | |
|---|---|
| Dated: May 17, 2024<br>Wilmington, Delaware | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br><br>*/s/ Curtis S. Miller*<br>Curtis S. Miller (No. 4583)<br>Brenna A. Dolphin (No. 5604)<br>1201 N. Market Street, 16th Floor<br>Wilmington, Delaware 19801<br>Telephone: (302) 658-9200<br>cmiller@morrisnichols.com<br>bdolphin@morrisnichols.com<br><br>*Counsel to Tanger Management, LLC* |